WILLIAM H. REYNOLDS, AS COMPTROLLER, AND JOHN
A. PEARCE, AS SHERIFF, APPELLANTS, VS. THE
FLORIDA CENTRAL AND PENINSULA RAILROAD
COMPANY, APPELLE.

1.  Where, on an appeal in chancery, the decree is affirmed in part
and reversed in part, with directions for the entry of a proper
decree, and permission is given by the appellate court to apply
to the chancellor for leave to file a bill of review of a part of the
decree to be entered, the application to the extent permitted, if
made, must be governed by the general rules applicable to
obtaining leave and filing bills of review.

2.  Where, on an appeal in chancery, the decree is affirmed in part
and reversed in part with directions for the entry of a proper
decree, and permission be given by the appellate court to apply
to the chancellor for leave to file a bill of review of a several
part of the decree to be entered, the authority to entertain the
application is confined to the part of the decree as to which
permission is given to apply for leave to file the bill, and the
chancellor has no jurisdiction beyond this.

3.  The filing of a bill of review on the ground of newly discovered
evidence is not a matter of right, but leave to file the bill must
first be obtained and this rests in the sound discretion of the
court, subject to review by the appellate court.

4.  A bill of review on the ground of newly discovered evidence
should allege that it is filed by leave of the court; must state
the former bill and proceedings, including the final decree en-
tered, and the particulars in which the party conceives himself
aggrieved, and also state distinctly and specifically the evidence
alleged to have been discovered and that it came to the knowl-
edge of the party for the first time after the final decree, or too
late to be used at the hearing, and that by the exercise of rea-
sonable diligence it could not have been discovered sooner; and
further it must appear that the new evidence is not merely cum-
ulative or corroborative, but must be relevant and material and
likely to produce a different determination.

5.  The allegation of the discovery of new matter and that it could
not by the exercise of reasonable diligence have been discovered
before the trial, required to be stated in a bill of review on the
ground of newly discovered evidence, is material and constitutes
an essential equity in the maintenance of the bill, and when put
in evidence must be established by clear and decisive proof.
(Taylor, C. J., dissenting).

Appeal from the Circuit Court for Leon County.

*Statement.*

In November, 1892, appellee filed a bill aginst the then Comptroller of the State, William D. Bloxham, and John A. Pearce, Sheriff of Leon county, to enjoin certain taxes for the years 1879, 1880 and 1881, assessed by the State, under acts of the legislature, on certain lines of railroad acquired by appellee. A decree was rendered in the case on bill, exhibits and answer in November, 1893, by the Hon. John F. White, Judge of the 3rd Circuit, in place of the Hon. John W. Malone, Judge of the 2nd Circuit, who was disqualified. The pleadings in the cause, the decree of the Circuit Court, and the decision of this court on appeal are exhibited in the statement and report of the case, Bloxham, Comptroller, v. Florida Central and Peninsular R. R. Co., in 35 Fla. 625, 17 South. Rep. 902. In addition to what is shown by the report, it appears from the bill that it was singed "The Florida Central & Peninsular Railroad Company, by John A. Henderson, Vice-President," and was sworn to by him. The decision of the Circuit Court, as shown by the report mentioned, was affirmed in part and reversed in part, with directions, and, upon a return of the case to the Circuit Court, appellee obtained permission and filed a supplemental bill in the nature of a bill of review, to which a demurrer was interposed and overruled by the Circuit Judge. On appeal this ruling was reversed with directions to dismiss the supplemental bill in the nature of a bill of review, and to enter a decree in compliance with the mandate of this court under its former decision. This court held, on the appeal from the demurrer to the

supplemental bill in the nature of a bill of review, that when the appellate court affirms the decree of the lower court or when such decree is modified on appeal, either as to questions of law or fact necessarily involved, with directions for further proceedings consistent with the opinion, the lower court has no authority to open the case for a new trial or to enter any other judgment than that directed to be entered, unless authority to do so be given by the appellate court. The proceedings on this supplemental bill in the nature of a bill of review, and the decision of this court on the appeal, are shown by the report in 39 Fla. 243, 22 South. Rep. 697. When this decision was made, no final decree had been entered by the Circuit Court and further directions were then given to enter the decree, with permission to appellee to apply within ninety days after the entry thereof, to the Circuit Court for leave to file a bill of review to the extent of the line of railroad involved in the suit from Jacksonville to Chattahoochee and its branches.

The decree was entered and within the time mentioned appellee applied by petition to the Circuit Court for leave to file a bill of review, and therein set out the original bill and substance of the answer filed thereto (shown by the case in 35 Fla. 625, 17 South. Rep. 902), the dercee of the Circuit Court made therein and the appeal therefrom and decision of this court in reference thereto; that before any decree was entered by the Circuit Court in compliance with the mandate of the Supreme Court, petitioner filed, by leave of the Circuit Court, a supplemental bill in the nature of a bill of review, to which a demurrer was filed and overruled; that an appeal was taken to the Supreme Court, and the

Reynolds v. F. C. & P. Ry. Co.—Statement of Case.

order overruling the demurrer was reversed and a mandate (set out in full) was sent to the Circuit Court.

The petition alleged that at the time of the rendition of the decree under the mandate, William D. Bloxham was not Comptroller, but one William H. Reynolds had qualified and had been commissioned as Comptroller of the State, and has continued as such.

The petition further proceeded as follows: Your petitioner further shows that all the foreclosure proceedings, judicial sales, receiverships and transfers of the several lines of railroad and railroad property mentioned and set forth in petitioner's original bill of complaint aforesaid were had in and under the authority of the Circuit Court of the United States for the Northern District of Florida, and all the orders, decrees, receivers' accounts and other papers and documents relating thereto or connected therewith were filed or recorded as a part of and among the records of said court. That before the filing of petitioner's said original bill, and, to-wit: on the 29th day of May, A. D. 1891, the court house or building in Jacksonville, Florida, where said court was held and its records kept, was together with all of said records, files, papers and documents, lost and destroyed by fire; and your petitioner was thereby deprived of much of the valuable information and evidence necessary in the preparation of its said bill, and was forced to rely largely on the memory of individuals of long past transactions and occurrences, hearsay, and some meagre printed reports of some of the cases made in appellate courts, all of which was in many instances indefinite, incomplete and unreliable.

That your petitioner is a corporation that had no existence at the time of many of the transactions re-

ferred to, and was not created till several years after the making of the assessments complained of, but was formed to own and operate the said railroad properties that had been purchased by people at a judicial sale in 1887, who were unfortunate creditors of the previous owner and who were entire strangers to the property prior to their purchase, so your petitioner was not informed of the real facts as hereinafter stated, and was not advised of their materiality, nor put upon notice of the importance in value of a statement thereof as a deraignment of title by an issue raised in the pleadings, since the narrative of title in petitioner's original bill was only in explanation of the situation at the time of assessment, which justified the allegation in the bill of an entire change of ownership for value of the entire property before the date of such assessment; to which averments issue was made by defendants' answer admitting the alleged conveyances and denying, as upon demurrer to the bill, that petitioner acquired any immunity from taxation for the years 1879, 1880 and 1881.

That the Supreme Court decided, in effect, that the State did not have the power to follow this property for the taxes of 1879, 1880 and 1881 by assessment in 1885 if it had ceased to be in the possession and ownership of the persons to whom it belonged during the time for which such assessment was made, into the hands of innocent purchasers for value, and reached its conclusion that the railroad from Jacksonville to Chattahoochee River, with branches to Monticello and St. Marks, was owned and operated by Edward J. Reed and associates from September, 1879, to February, 1882, by a wholly mistaken view of the facts not in issue in the case or submitted, and upon an interpretation of the statements of

the bill that is entirely at variance with the facts as they existed, and the understanding and purport of such statements at the hearing below. That while said original bill on pages 14 and 15 does allege that Edward J. Reed and associates purchased said line of road at foreclosure sale September 25th, 1879, and conveyed the same February 28th, 1882, to a company organized and known as the Florida Central and Western Railroad Company, said bill is silent in its allegations as to the possession and ownership of said line of railroad during the time intervening between September 25th, 1879, and February 28th, 1882. And petitioner shows that since the said opinion was rendered, with the aid of its counsel, some old letters and portions of accounts have been found which have led to the discovery of what was the actual status of the possession and ownership of said property during said interval, which before then was not known by your petitioner and which could not be found by it, although it exercised great diligence in the search for the actual facts to set them forth in its bill, and your petitioner now alleges as evidence discovered since the rendition of said opinions by said Supreme Court, that in fact and in truth during all these years, covering the whole of the period for which these taxes are assessed and for the entire time between Septmber, 1879, (and before) and until February 28th, 1882, a company known as the Jacksonville, Pensacola and Mobile Railroad Company, owned that part of the aforesaid line of railroad between Lake City and Chattahoochee with branches to St. Marks and Monticello, and it was possessed, used and operated by receivers of the United States Court, viz: Sherman Conant and A. B. Hawkins, who retained the possession of said road and received

and retained the tolls and revenues thereof from September, 1879, the date of the sale alleged in the original bill, until after the said sale was confirmed by said court. That on the 10th day of February, A. D. 1882, the said H. R. Jackson, Chas. H. Symonton and Adolph Engler, purchasers at the sale aforesaid, conveyed the said line of railroad for value to said Edward J. Reed, before which last named date Reed and his associates were not owners of and were not possessed of said property, nor in receipt of any of its incomes, or in any way interested therein. That the portion of said road between Lake City and Jacksonville was owned and possessed and enjoyed by the Florida Central Railroad Company, its owners for many years, until the judicial sale thereof on the 6th day of January, 1882, when it was purchased by Edward J. Reed, who for the first time became possessed of the said line of railroad after the confirmation of said sale occurring thereafter within less than ten days from the date of sale aforesaid.

That said foreclosure sales and receiverships were had in and under the authority of the Circuit Court of United States for the Northern District of Florida, and all the records and papers of said court in said causes were destroyed by fire as hereinbefore said before the preparation and filing of petitioner's said original bill. That Sherman Conant, one of the aforesaid receivers, had died prior to that time, and A. B. Hawkins, the other receiver, had removed from the State of Florida to the State of North Carolina. That your petitioner incurred great expense and labor in the preparation of its said original bill occasioned by the destruction and loss of the court records aforesaid, and the great time that has elapsed since the occurrence of many of the trans-

actions therein narrated, and exercised all due and reasonable diligence to ascertain, discover and set forth every fact material to its case. That the aforesaid new matter was not known to your petitioner, and by the exercise of due and reasonable diligence could not be discovered and produced at the hearing upon said original bill, and your petitioner again avers that it did exercise extraordinary diligence and did avail itself of all known sources of information in its efforts to obtain and set forth in its bill the actual facts of each and every the events, incidents, changes, sales and åll other proceedings material to the full advisement of the court in and about the fair determination of the questions involved in said controversy, and that it omitted nothing therefrom that was available to it in the exercise of such diligence.

And your petitoner most respectfully submits and suggests that while there was no change in the (legal) ownership and possession of the several lines of railroad acquired by the Florida Railway and Navigation Company from the time of its organization till the assessments were made, still it is charged in petitioner's bill and admitted by defendants' answer that after said property was acquired by the Florida Railway and Navigation Company and before it was assessed for taxes for the years A. D. 1879, 1880 and 1881, and to-wit: on July 1st, 1884, and before the passage of Chapter 3558 laws of Florida, under which such assessment was made, that said company issued its bonds (such assesment was made that said company issued its bonds) to the amount of $10,000,000, and that $5,000,000 of said bonds were actually disposed of to holders for value, secured by mortgage or deed of trust upon all the said lines of rail-

road property. And also that at the time of the formation and consolidation of the original and constitutent railroad companies mentioned in said bill into the said Florida Railway and Navigation Company each and every of said several constituent companies had outsanding and unpaid large amounts of bonds by them severally theretofore issued, and secured by mortgage or deeds of trust upon said several lines of railroad respectively. That upon the failure of the said Florida Railway and Navigation Company to pay a certain common law judgment rendered against it in favor of W. B. Cutting for moneys borrowed and for defaults in the payment of the interest on the underlying bonds aforesaid of the said several constituent companies, the lines of railroad of said Florida Railway and Navigation Company were upon bills filed by said Cutting and by the several Trust Companies representing the holders of said bonds in the Circuit Court of the United States for the Northern District of Florida, for the foreclosure of said liens, sold under the decree and authority of said court in the year A. D. 1889, severally under their first liens and as a whole under the lien of the mortgage created by the Florida Railway and Navigation Company as aforesaid, and that W. B. Cutting, as agent, bought the said property and conveyed to your petitioner's company which he and his associates had organized for that purpose, and that petitioner is no otherwise whatever the successor of said Florida Railway and Navigation Company and it holds its property by virtue of liens created long prior to the assessment made under Chapter 3558 Laws of Florida.

And your petitioner respectfully submits that under undisputed facts your petitioner occupies the legal posi-

tion and attitude of a *bona fide* purchaser for value of the whole of said property at the date of the execution of said several mortgages or deeds of trust, and that at said several dates the State has made no assessments and had taken no steps whatever to collect the said taxes; that no taxing statute had affixed any lien upon said property, and that at the date when said consolidated bond issue was made under which the system as a whole was sold, the time for the assessment and collection of taxes for the years 1879, 1880 and 1881 had passed, and that Chapter 3558, under which the assessment was subsequently made, was not enacted until February 12, 1885; and having acquired its said property by purchase at the judicial sales aforesaid, your petitioner respectfully submits that it stands in the attitude of a *bona fide* purchaser of said property for value as of the dates of the said several liens securing the bond issues aforesaid, and should have been so adjudged by the court and decreed to hold the same exempt from the payment of the taxes so assessed for the years 1879, 1880 and 1881. And your petitioner suggests and assigns the failure of the court so to decree as error in law apparent upon the face of said decree, for which the same should be reviewed and reversed. Your petitioner further shows that the decree rendered by the Judge of the 3rd Judicial Circuit on June 19th, 1897, as a final decree, is informal and imperfect and within itself unintelligible, as it can only be read in connection with and by reference to the decree of November 25th 1893. That it was rendered for and against W. D. Bloxham, as Comptroller, who was not at that time the Comptroller of the State of Florida, and there were no proper parties to said cause at the date of the rendition of said decree.

Wherefore your petitoner prays that leave be granted it to file a bill of review to review the aforesaid final decree rendered as herein aforesaid, upon the grounds of the newly discovered evidence aforesaid and the error in law appearing upon the face of the said decree aforesaid, and that petitioner be permitted by way of supplement to make William H. Reynolds, as Comptroller of the State of Florida, a party defendant thereto in lieu of the original defendant, W. D. Bloxham, who has ceased to be such Comptroller. And for such other and further relief in the premises as the nature of the circumstances of this case may require.

The petition was singned "The Florida Central and Peninsular Railroad Co., by H. R. Duval, President;" and in his affidavit attached thereto it is stated that he had carefully read the petition and the facts therein set forth, as of petitioner's own knowledge, were true, and those stated upon information derived from others he believed to be true; that the new matter set up in the petition as a basis for filing a bill of review was not known to petitioner at the date of the hearing upon the original bill in the cause, and by the use of reasonable diligence could not have been known or produced at said hearing, and the same had first come to the knowledge of petitioner since said hearing; and that all the statements therein made as to the time, manner and circumstances of the discovery of said new matter, and the difficulty attendant upon such discovery were true as stated in the petition.

On this petition the Circuit Judge entered an order making William H. Reynolds, Comptroller, a party defendant in place of William D. Bloxham, and that peti-

tioner be allowed to file a bill of review in the cause as prayed for in the petition.

. Thereupon a bill of review was filed against W. H. Reynolds, Comptroller, and John A. Pearce, Sheriff, alleging in substance the same as stated in the petition for leave to file it, and including the signing of the bill and an affidavit thereto by H. R. Duval, as president.

Subsequent to the filing of this bill the defendants therein applied to this court for a prohibition against the Judge of the 3rd Circuit and the railroad company, and the proceedings thereon are fully stated in the case of the State ex rel. W. H. Reynolds, Comptroller, v. White, Judge, 40 Fla. 279, 24 South Rep. 160.

On the suggestion for prohibition it appeared that a formal demurrer had been filed to the bill of review, but on the present record there is no demurrer other than that contained in an answer. Appellants answered the bill of review and with other of the allegations denied that the new matters therein stated were unknown to complainants, or that by the exercise of due and reasonable diligence they could not have discovered them and produced them at the hearing on the original bill. The answer also claims by demurrer that the new matters stated in the bill are immaterial and insufficient to cause a reversal of the decree.

A general replication was filed to the answer, and after testimony taken the court entered a final decree and adjudged that so much of the prayer of the bill as seeks to enjoin defendants from the collection of the taxes assessed in 1885 for the years 1879, 1880 and 1881 on the line of railroad between Fernandina and Cedar Keys, and Waldo and Ocala, and on the line from Ocala to Wildwood, for the year 1881, be denied, and that the

collection of the taxes assessd for the years 1879, 1880 and 1881 on the line of railroad between Jacksonville and River Junction (Chattahoochee), with branches to St. Marks and Monticello, be enjoined. From this decree the present appeal is taken.

The other facts in the case are stated in the opinion of the Court

*The Attorney General*, for Appellants.

*Brief for Appellants.*

This is an appeal from a final decree of the Circuit Court of Leon county, in Chancery, bearing date the 6th day of January A. D. 1900.   William H. Reynolds as Comptroller of the State of Florida and John A. Pearce as Sheriff of Leon county, Florida, are the appellants and the Florida Central and Peninsular Railroad Company is the appellee.

The assignment of errors are the following: ·

(1) The Circuit Court erred in making the order dated September 13th, 1897, granting leave to the Florida Central and Peninsular Railroad Company to file a bill of review in accordance with the prayer of its petition therefor.

(2) The Circuit Court erred in making and granting the decree dated January 6th, 1900.

(3) The Circuit Court erred in decreeing that so much of said proceedings as prays that the defendant be enjoined and restrained from the collection of taxes assessed in 1885 for and on acocunt of the State of Florida on the line of railroad of the complainant company that lies between Fernandina and Cedar Keys and Waldo

and Ocala for the years 1879-1880 and 1881 and on the line from Ocala to Waldo to Wildwood for the year 1887, be and the same is hereby denied.

(4) The Circuit Court erred in decreeing that as to the taxes thus assessed for the years 1879, 1880 and 1881, the collection of which is likewise prayed to be enjoined on so much of the lines of the railroad of the complainant as lies betwen Jacksonville and River Junction with branches thereof to Monticello and St. Marks, the prayer of the said complainant is granted and the defendant William H. Reynolds, as Comptroller of the State of Florida, and John A. Pearce, as Sheriff of Leon county, be and they are hereby forever enjoined from collecting the same or in any wise interfering with said complainant on account of the same.

(5) The Circuit Court erred in decreeing that as to the prayer of the complainant as in said proceedings made other than as herein allowed, be and the same are hereby denied.

(6) The Circuit Court erred in decreeing that the defendants do pay the costs herein to be taxed by the clerk.

(7) The Circuit Court erred in not dismissing the bill of review.

We will now discuss these several assignments of error in the order in which they are stated above.

It will be observed that this court had previously decided in this suit, that without its permission the Judge of the Circuit Court was powerless to entertain an application from the said railroad company to file a bill of review: yet it granted such permission. However, the permission thus granted was not unrestricted in its scope, but was confined and limited to the line of rail-

road between Jacksonville and Chattahoochee and branches to St. Marks and Monticello, for newly discovered matter only. The order granting this permission does not in any manner interfere with the exercise by the Circuit Court, of its discretion to grant or refuse leave to said railroad company to file a bill of review within the restrictions and limitations therein stated, but leaves the Circuit Court untrammelled in this respect.

Now this first assignment of error raises the question, whether the said railroad company has stated such a case in its petition for leave to file a bill of review as authorized the Chancellor or Judge of the Circuit Court, in the exercise of a sound legal discretion to grant the order which constitutes this assignment of error.

A correct decision of this question will necessitate a critical examination of the contents of said petition. Adverting to the petition we find that it contains a recital of the prior proceedings in this suit and then a statement, that since the rendition of the opinion of this court the petitioner has discovered that during the entire time between September, 1879, and February 28th, 1882, the Jacksonville, Pensacola and Mobile Railroad Company owned the line of railroad between Lake City and Chattahoochee with branches to St. Marks and Monticello, but that it was possessed, used and operated by Sherman Conant and A. B. Hawkins as receivers of the United States Circuit Court who received the tolls and revenues thereof from September, 1879, until the confirmation of the sale thereof. And that Henry R. Jackson, Charles H. Simonton and Adolph Engler who were the purchasers thereof at said sale conveyed the said railroad to Edward J. Reed for value, on the 10th day of February, 1882, and that before the last mentioned date Edward J.

26

Reed and his associates were neither possessed of said railroad, nor in receipt of any of its incomes nor in any manner interested therein.   And that the railroad from Lake City to Jacksonville was owned and possessed by the Florida Central Railroad Company for many years until the judicial sale thereof on the 6th day of January, 1882, when it was purchased by Edward J. Reed, who for the first time became possessed of said line of railroad, after the confirmation of said sale, which occurred within less than ten days thereafter. Record page 122 et. seq.

It is a universal rule, in petitions of this character, that the petitioner must show that the new matter has come to his knowledge and his agents' for the first time, since the period at which he could have made use of it in the suit, and that it could not with reasonable diligence have been discovered sooner, and that it is of such a character that if it had been brought forward in the suit it probably would have altered the judgment or decree.

Ency. Pl. & Pr. 3 vol. 587-588.   Owens vs. Forbes 9 Fla. Rpts. 326.   Finalyson vs. Lipscomb, 16 Fla. 751. 2 Daniell's Chy. Pl. & Pr. page 1578.   2 Beach Modern Equity Practice, Secs. 860, 862 and 868.   Story Eq. Pl. Sec. 412, et seq.

Now let us apply this rule to the petition under consideration for the purpose of ascertaining whether it fulfills the requirements thereof.

Upon a careful examination of the petition we have been unable to discover therein any allegation that the newly discovered matter has come to the knowledge of the petitioner and its agents for the first time since the period at which it could have made use of it in the suit. Indeed the date of the petitioners first knowledge of the new matter is not stated.   The nearest approach to it is

an allegation, that the aforesaid new matter was not known to petitioner and by the exeecise of due and reasonable diligence could not be discovered and produced at the hearing upon the original bill. Record page 123.

It may be true that the petitioner had no knowledge of this new matter at the time of the hearing on the original bill and yet the petitioner's agents, officers or counsel may have had knowledge thereof, in ample time to have used it in the suit. And it is a significant fact that such knowledge by the petitioner's agents, officers and counsel is not denied either in said petition or the affidavit thereto attached. In this connection I will refer to the dissenting opinion of Justice Carter in this suit to show that petitioner's counsel must have had knowledge of the alleged new matter prior to the hearing on the original bill.

And furthermore the petitioner does not state in his petition what effort, if any, was made prior to the opinion of this court to discover the new matter alleged therein. It does not appear from any allegation in said petition that any inquiry was ever made of Phillip Walter the former Clerk of the United States Circuit Court for the Northern District of Florida or of A. B. Hawkins the receiver of said court, or Adolph Engler, the alleged purchaser of the railroad touching this new matter, until after the rendition of the opinion of this court in this suit. Neither does it appear from any allegation therein that any search was ever made of the public records in the office of the Secretary of State of the State of Florida or of the public records in the clerks offices of the several counties through which said railroad runs, to ascertain and discover said new matter prior to the opinion ren-

dered by this court in this suit. Indeed it does not appear from anything contained in said petition that any search was made in any place where such new matter was likely to be discovered or that any inquiry was ever made of any person who was likely to have knowledge of such new matter, until after this court had rendered its opinion in this suit. It is true that the petitioner alleged that it used all due and reasonable diligence to discover, ascertain and set forth said new matter; but this is simply a statement of its conclusion and is insufficient. The petitioner must state facts and circumstances showing diligence on his part, and not rest upon a naked averment which is simply his conclusion.

(3) Ency. Pl. & Pr. Note 3, 587-588; 2 Daniell's Ch. Pr. (6th Amer. Ed.) 1578; 36 Ark. 532; 5 Baxter (Ten.) 640; 8 W. Va. 174; 78 Va. 413; 49 Miss. 782; 1 Gill. & J. Md. 393; 45 N. J. Eq. 41; 77 Va. 600; 2 Ten. Ch. 85; 4 Wall. (U. S.) 512.

The only legitimate inference that can be drawn from the omisssion from the petition of such material allegations as these, is that the petitioner has exercised no diligence whatever to discover and ascertain this new matter prior to the hearing on the original bill. And when we reflect how accessible to the petitioner this new matter was, and how easy it could have been discovered and produced prior to the hearing, and how quickly it was discovered after the opinion of this court was rendered, we are forced to the conclusion that the petitioner has not only failed to exercise that reasonable diligence which the rule in such cases requires, but that it has been guilty of negligence.

Moreover, the petition has failed to show how this new matter could have altered or changed the decree, if

it had been known in time and produced at the hearing. And we are unable to perceive how it could have affected it. Let us for a moment analyze this new matter and ascertain what bearing if any it can possibly have upon the decree. And for this purpose we will assume it to be true.

It is indisputable, that the railroad from Jacksonville to Chattahoochee with branches to St. Marks and Monticello, was subject to taxation for the years 1879, 1880 and 1881, notwithstanding the omission of the proper officer of the State to assess it for that period and the mere fact that it was in the possession of receivers of the United States Court, instead of the possession of the owners, during that time, did not relieve it from liability to taxation. Indeed the possession of this railroad by receivers during those years can cut no figure in this case.

And assuming it to be true as alleged in the petition for the bill of review, as newly discovered matter, that the railroad from Lake City to Chattahoochee with branches to St. Marks and Monticello, was owned by the Jacksonville, Pensacola and Mobile Railroad Company during the said years 1879, 1880 and 1881, and on the 10th day of February, 1882, Henry R. Jackson, Charles H. Simonton and Adolph Engler, conveyed said railroad for value to Edward J. Reed who before, then was not interested therein; and that the railroad from Jacksonville to Lake City was owned by the Florida Central Railroad Company during said years 1879, 1880 and 1881, and until the judicial sale thereof on the 6th day of January, 1882, when it was purchased by Edward J. Reed, who then became possessed thereof for the first time; non constat, that he was an innocent purchaser of

said railroad for a valuable consideration and without notice of the States claim to these back taxes. To constitute him such a purchaser it must be averred that the consideration money has been bona fide and truly paid; also it must be stated what has been paid; and a general allegation that a full and fair consideration has been paid is insufficient. Nor can the recital in the deed be received in lieu of the statement of fact. High vs. Battle & Bradley, 10 Yerger 336. Jewett vs. Palmer, 7 John Chan. 65.

The petition for the bill of review contains no averments of this character. It is not alleged therein that the conveyance from Henry R. Jackson, Charles H. Simonton and Adolph Engler to Edward J. Reed of the railroad from Lake City to Chattahoochee with branches to St. Marks and Monticello, was made for a valuable consideration, which was paid by him. The nearest approach to it, is the allegation that they conveyed it to him for value; and this is insufficient to constitute him an innocent purchaser, and too ambiguous for any purpose whatever. Neither is it alleged therein that Edward J. Reed paid any consideration for the railroad from Jacksonville to Lake City which he purchased at the judicial sale thereof on the 6th day of January, 1882. Besides the petition contains no denial of notice by Edward J. Reed of the States right to tax said railroad for the years 1879, 1880 and 1881 on account of the omission of the proper State officer to assess the taxes thereon for said years at the time it was conveyed to him and before any consideration was paid by him therefor.

Want of notice is an essential element to an innocent purchaser; and if he rests his claim on the fact of being an innocent bona fide purchaser it is a rule of uni-

versal application that he must deny notice positively and not evasively, although it be not charged. Besides he must deny fully and in the most precise terms every circumstance from which notice could be inferred. Gallitin vs. Cunningham 8 Cowen, 373.

The omission from the petition of such material allegations as these is significant. But it would be unjust to the petitioner, in view, of the great research, it has displayed in the preparation of this case, to attribute this omission to inadvertence. Therefore we must infer that these allegations were omitted on purpose because the petitioner was unable to establish them by proof. Be that as it may, the omission is fatal to the petitioner's effort to show that Edward J. Reed was an innocent purchaser of said railroad for a valuable consideration. And in this aspect of the newly discovered matter, we are unable to perceive how it could have affected the decree, if it had been discovered in time, and produced at the hearing on the original bill.

The foregoing observations are submitted upon the assumption that the Jacksonville, Pensacola and Mobile Railroad Company owned the railroad between Lake City and Chattahoochee with branches to St. Marks and Monticello during the years 1879, 1880 and 1881, but this assumption is not supported by the allegations in the petition. The averments of the ownership of said railroad during those years by said company is inconsistent with other averments in the petition; that is, the sale of it on the 25th day of September, 1879, under a decree of foreclosure in the United States Circuit Court aginst said company and the purchase thereof at said sale by Henry R. Jackson, Charles H. Simonton and Adolph Engler. The date of the confirmation of this sale is not

stated and in the absence of such statement we must presume that it was confirmed immediately thereafter; because the rule which requires all of the allegations in a pleading to be taken most strongly against the pleader is applicable to the petitioner.

It is evident that the legal effect of this sale was to divest said company of its title to and ownership of said railroad and vest it in said purchasers. Consequently Henry R. Jackson, Charles H. Simonton and Adolph Engler who were such purchasers, held the legal title to said railroad from the date of said sale until they conveyed it to Edward J. Reed and the said company did not own it during that period.

But the question occurs to us whether they were bona fide purchasers or simply agents or naked trustees for Edward J. Reed or some one else in this transaction; and was their conveyance of said railroad to him voluntary and without any consideration? The petition contains no answer to these questions although they suggest matters of vital importance to the petitioner's case. We observe nothing in the petition which negatives the suggestion that these purchasers were simply the agents or trustees for Edward J. Reed or some one else in this transaction and that their conveyance of said railroad to him was voluntary. The burden was on the petitioner to show that such was not the state of the case, and it has failed to do so.

It is indisputable that said railroad would be subject to the back taxes for 1879, 1880 and 1881 under the state of facts above suggested. And these must be presumed to be true, in considering the petition, as everything must be presumed in favor of the decree of the court in the original suit, which the petition does not dis-

prove. George vs. George, 67 Ala. 192; Goldsby et al. vs. Goldsby, 67 Ala. 560.

But there is another aspect in which this new matter must be considered. How could it have been used if it had been discovered before the hearing on the original bill? It does not support the case made in the original bill; consequently it was neither material or relevant evidence therein and would not have been admissible as evidence. Indeed it would introduce new issues and make a new case, inconsistent with the case made in the original bill. It is stated in the petition that the new matter was not in issue in the original suit; therefore a bill of review is not applicable.

In Patterson vs. Slaughter Ambler 293, Lord Hardwicke says: "All the bills of review I recollect to have known, were of new matter, to prove what was put in issue. Lord Effingham's case was so; he claimed under an old entail and though he afterwards made title under a different entail, yet the issue was a claiming under some old entail generally. In the present case it is not new matter to prove what was put in issue, but to prove a title that was not in issue, and therefore the defendant could not be entitled to a bill of review."

In Young vs. Keighly, 16 Vesey 355, Lord Eldon expressed the same views and his opinion carries more weight, because he seems to have felt, that he was deciding against the probable substantial justice of the case. The petitioner therefore seeks a relief which Lord Hardwicke and Lord Eldon have both declared not to be allowable.

In Partridge vs. Usborn, 5 Russell 195, Lord Lyndhurst held that matter discovered after a decree has been made though not capable of being used as evidence of

anything which was previously in issue in the cause, but constituting an entirely new issue may be the subject of a supplementary bill in the nature of a bill of review.

This last decision is unprecedented, and prior thereto, it was the settled law, that it must be new matter to prove what was before in issue, not to make a new case but to establish the old one, in which bills of review were allowable at all. And the case of Partridge vs. Usborne Supra, has not established a new rule and overthrown the old one in this particular, but has simply excepted cases of that description, from its operation. It must be observed that the Lord Chancellor in this latter case, restricted and limited his decision to a suit of like description as the one which he had under consideration, and did not extend it to suits generally.

In the case of Owens vs. Admrs. of Forbes, 9 Fla. 334-335, this court says the new matter must be relevant and material and such as might probably have produced a different determination. In other words it must generally be new matter to prove what was before in issue and not to prove a title not before in issue; not to make a new case, but to establish the old one.

We will now discuss the second, fourth and seventh assignments of error, together, as the same reasoning and authorities are applicable to each of them alike.

The bill of review is restricted and limited in its scope, to so much of the decree as relates to the railroad from Jacksonville to Chattahoochee with branches to St. Marks and Monticello and to matters newly discovered. It contains the same identical new matter which is contained in the petition for leave to file said bill. The answer claims the benefit of a demurrer to said bill. Record page 201. In discussing the first assignment of error we

endeavored to show that the plaintiff's solicitor and vice-president must have known of this alleged new matter prior to the hearing on the original bill; and that the plaintiff failed to exercise reasonable diligence to discover and produce it at said hearing; and that even if it had been produced thereat, it was immaterial and irrelevant and could not have affected the decree. And furthermore that such matter could not be introduced by a bill of review. The same reasoning and authorities which are applicable to this first assignment of error are likewise applicable in considering the demurrer to the bill of review.

But there are additional reasons that can be urged in support of the demurrer. The new matter alleged as a ground for the bill of review is a purchase for a valuable consideration and without notice of the State's claim. This if it were true can only be used as a defense; and cannot be made the subject of a bill of review because it creates no title paramount to that of the State. It is merely a ground to induce a court of equity not to interfere.

Mitfords Eq. Pl. (5 ed.) 104. Patterson vs. Slaughter Ambler, 293.

The authorities in support of the foregoing proposition seems to be uniform, and we have been unable to find any against it.

The principle upon which an innocent purchaser can successfully invoke the protection of a court of equity, is, that where the denfedant has an equal claim to the protection of a court of equity to defend his possession as the plaintiff has to the assistance of the court to assert his right the court will not interfere on either side. Mitfords Eq. Pl. (5 ed.) Story Eq. Pl. sec. 805.

Therefore a purchase for a valuable consideration and without notice, confers no right upon the purchaser which can be enforced in a court of equity by an original bill, cross bill or bill of review or otherwise; but simply commends him to such favorble consideration as will induce the court to withhold assistance from his adversary and not interfere at all.

The answer not only claims the benefit of a demurrer to the bill of review but denies that the new matter alleged therein is true; and also denies that the plaintiff has exercised reasonable diligence to discover it in time to be used at the hearing on the original bill. Therefore the burden is on the plaintiff to establish the truth of these several allegations by sufficient proof to overcome the denials contained in the answer before he is entitled to relief. As the alleged newly discovered matters which relates to the railroads from Lake City to Chattahoochee with branches to St. Marks and Monticello differs from that which relates to the railroad from Jacksonville to Lake City we will discuss them separately.

Now as to the former railroad it is alleged as new matter that the Jacksonville, Pensacola and Mobile Railroad owned it during the entire time between September, 1879, and February 28th, 1882. And that Henry R. Jackson, Charles H. Simonton and Adolph Engler, who were the purchasers thereof at the sale of September 25th, 1879, conveyed it to Edward J. Reed for value on the 10th of February, 1882, and before that Edward J. Reed and his associates were not interested in it. Record page 191 et seq. This is denied in the answer. (Record page 200.) To support this new matter the plaintiff has put in evidence the deposition of Alexander B. Hawkins, Phillip Walter and Adolph Engler to which we will now

refer for the purpose of ascertaining how far they support it.

Adverting to the deposition of Alexander B. Hawkins we find that he testified as follows: "We were in receipt of the earnings and revenues of said railroad for over four years and we turned over the possession control and ownership of said railroad to the purchasers of same some time in the early part of 1882. The purchasers were Henry R. Jackson, Charles H. Simonton and Adolph Engler. These purchasers neither as trustees or in any other capacity, had any control, possession, use, occupation enjoyment, or other interest in the management of the whole of that railroad embraced in said litigation, or any part thereof during any of the time between the time of the judicial sale in September, 1879, up to and including the 1st of February, 1882. The receivers during all this time had entire control and management of said road." * * *: Answer to 5th direct interrogatory. Record pages 210-211. This witness further testified as follows: "We as receivers made the sale of said railroad. I do not remember the exact price, but the consideration was payable partly in bonds and partly in money. I do not remember what proportion nor do I remember any distinction in bonds growing out of the numbers or the difference in declared liens as controlled by the numbers." Answer to 7th interrogatory. Record page 211.

This constitutes all of the testimony of this witness relative to this new matter and it may be epitomised by stating, that the witness and Sherman Conant as receivers sold said railroad in September, 1879, under a decree of the United States Circuit Court, and that Henry R. Jackson, Charles H. Simonton and Adolph Engler pur-

chased it at said sale but did not take possession of it until the early part of 1882. The receivers remained in possession of it in the meantime operated it, and received the tolls and revenues arising therefrom and accounted to the court for the same. The purchase price was not remembered by this witness, but the consideration was payable partly in bonds and partly in money.

This witness is evidently mistaken in his statement of the representative character in which he and Sherman Conant acted, in making the sale of this railroad, as the evidence to which we will hereafter refer and comment on, shows that they were acting as *Special Masters* of the court, and not as receivers, in making such sale. It will be observed that this testimony neither supports the allegation that the Jacksonville, Pensacola and Mobile Railroad Company owned said railroad during the period intervening September, 1879, and February 28th, 1892, nor that Henry R. Jackson, Charles H. Simonton and Adolph Engler conveyed said railroad to Edward J. Reed for value on the 10th of February, 1882, and that Reed before that time was not interested in it. But develops the fact that Col. John A. Henderson the general counsel and vice-president of the plaintiff company, was the attorney for Alexander B. Hawkins and Sherman Conant during their entire receivership and knew of their possession and control of said railroad for the period above stated, before the filing of the original bill in this suit. And his knowledge thereof was notice to the said company. Record pages 214, 235.

This witness further testified as follows: "That the roads of which he was receiver was sold about the year 1882, by the receivers under the direction of said court, that he does not remember who purchased them, but

whoever did purchase them were let into possession as soon as the sale was confirmed by the court, the date of which he does not remember, but it was in 1882 to the best of his recollection. Answer to direct interrogatory 14, Record page 237. This testimony conflicts with the preceding testimony of this same witness but it can be reconciled with it if we limit and restrict this latter testimony to the railroad from Jacksonville to Lake City. And no doubt the witness intended to restrict it to this railroad and we will so regard it.

Adverting to the deposition of Phillip Walter we find that he testified, that the consideration was part money and part bonds of the road. * * * . The purchase money was paid in bonds of the State of Florida on the line from Lake City to Chattahoochee of $1,000, each numbered from one to 2308, except that a small portion of said bonds, their pro rated share of $50,000, bid at the sale of that line was paid into the registry of the court for the retirement of the bonds. And all like bonds (for) of like denomination on the line from Jacksonville to Lake City, bonds numbered from 3000 upwards, 306 on which were declared liens nearly all were put in and a small portion paid in cash for their final retirement. * * * * These payments were made for and on account of Jackson, Simonton and Engler, trustees, and for Sir Edward J. Reed, who on or about the date named, on or about the first of January, 1882, became the purchaser at the judicial sale of the Florida Central Railroad and under the terms of this decree, he and they bought for the organization of the corporation and owned and operated the entire line afterward known as the Florida Central and Western. The judicial sale or sales of the line from Lake City to Chattahoochee

River had been made a long time prior to this, but the purchasers had not been put in possession because of delays caused by appeals to the Supreme Court of the United States and other reasons. The parties above named surrendered possession of the bonds and the proportionate share of the money. Answer to direct interrogatory 9th, Record page 220.

This comprises all of the testimony of this witness relative to this new matter and it will be observed also, that it does not support the allegation that the Jacksonville, Pensacola and Mobile Railroad Company owned said railroad during the period intervening September, 1879, and February 28th, 1882, and that Jackson, Simonton and Engler conveyed it to Edward J. Reed for value on the 10th day of February, 1882, and that Reed before that time was not interested therein. But it shows that the purchase price of said railroad was paid in bonds and money on account of Jackson, Simonton and Engler, trustees and Edward J. Reed and that they bought for the organization of the corporation afterwards known as the Florida Central and Western Railroad Company.

Adverting to the deposition of Adolph Engler we find that he testified as follows: I was associated with Henry R. Jackson and Charles H. Simonton in connection with the purchase of the Jacksonville, Pensacola and Mobile Railroad. * * *. Its termini were Jacksonville and River Junction on the west with branches to Monticello and St. Marks. We were *trustees under* a memorandum plan for the purchase of said railroad and its reorganization. Answer to 2nd direct interrogatory. Record page 225 and 226.

This witness further testified as follows: We three above named became the purchasers of said road at a

public sale thereof made by masters for the purpose of the sale or rather of so much of said road as laid between Lake City and River Junction aforesaid, being a road about one hundred and forty-nine miles and twenty-eight miles of branch road. The reason that only this portion of the road was sold was because of the decree of the court in forcing the bonds of the State of Florida, numbered from one to 3,000, of the nominal value of $2,808,000, only on so much of the line as was sold at the time of this purchase. That part of the road which laid between Jacksonville and Lake City and distance of sixty miles, was decreed not to be liable for these bonds, but in that decree it was made liable for a certain of the bonds numbered above three thousand. Appeals from this decree went up in both instances, but the lien upon the latter road was not enforced, I think because of the intervention of a supersedeas bond, which prevented the sale. Answer to 3rd direct interrogatory. Record page 226.

This witness further testified as follows: The possession of the road from Lake City west was not delivered to myself, and my associates named as such purchasers. The sale was some time in the year 1879, I think in August or September, but possession was not delivered to the purchasers until January, 1882. This delay in the delivery was occasioned by the litigations and appeals before referred to in my answer in a previous interrogatory. The receivers of the United States Circuit Court for the Northern District of Florida were during all this interval in possession of and in the operation of said railroad and they received and retained its tolls and revenues during the interval between the date of the sale and the time when the Florida Central and Wes-

tern Railroad Company, to whom we assigned our pur-
chase became vested with said road and the ownership
and possession of the same.   This was not earlier than
January or February of 1882.   Answer to 4th direct in-
terrogatory.   Record page 227.

And this witness further testified as follows:   As
previously stated myself and associates *as trustees made
an assignment of our purchase in 1882, through one Sir
Edward J. Reed, for the purpose of conveyance to the Flor-
ida Central and Western Railroad Company, a corporation
under the laws of Florida.*   We as trustees or otherwise
paid no money on account of said purchase.   The pay-
ment was made either by or through Reed on account
of said Florida Central and Western Railroad Company.
The consideration was nearly all of the two thousand
eight hundred and eight bonds of the State of Florida
numbered between one and 3,000, which were declared
a lien upon that particular part of said railroad and the
proportionate share of the bonds not paid in as de-
termined by the decree.   The consideration thus paid
was a valuable consideration.   Answer to 7th direct in-
terrogatory.   Record pages 228 and 229.

This comprises all of the testimony of this witness
relative to this new matter and it does not support the
allegations, that the Jacksonville, Pensacola and Mobile
Railroad Company owned this railroad during the
period intervening September, 1879, and February 28th,
1882, and that Henry R. Jackson, Charles H. Simonton
and Adolph Engler conveyed it to Edward J. Reed for
value on the 10th of February, 1882, and that Reed be-
fore that time was not interested therein.   But it shows
a different state of facts altogether.   It shows that the
said Jackson, Simonton and Engler were trustees under

a memorandum plan for the purchase of said railroad and its reorganization. And in furtherance of this plan they actually purchased said railroad at the judicial sale thereof on the 25th day of September, 1879, but paid no money therefor. The purchase price was paid in bonds by or through Edward J. Reed on acount of the Florida Central and Western Railroad Company a corporation afterwards created under the laws of the State of Florida, and composed of the persons or individuals for whom the said Jackson, Simonton and Engler as trustees made said purchase. These trustees afterwards made a voluntary conveyance of said railroad to Edward J. Reed, who thereafter and on the same day made a voluntary conveyance of it to the said Florida Central and Western Railroad Company in accordance with said *memorandum plan.*

The deposition of Adolph Engler to these facts is corroborated by the written evidence introduced by the defendants, as will be observed by referring to the recital in the deed of conveyance from Henry R. Jackson, Charles H. Simonton and Adolph Engler as trustees to Edward J. Reed dated March 4th, 1882, on record page 252 et. seq; also by referring to the recital in the deed of conveyance of said railroad from Edward J. Reed to the Florida Central and Western Railroad Company dated the same day and year, March 4th, 1882, on Record page 249 et. seq.

It appears from this evidence that the said Jackson, Simonton and Engler were agents or naked trustees for the corporators of the Florida Central and Western Railroad Company in this transaction and that these corporators were the real purchasers of said railroad at the judicial sale thereof on the 25th day of September, 1879.

If that be so, then the railroad was subject to the back taxes for 1879, 1880 and 1881. But it may be contended that the title to said railroad did not vest in these purchasers until the sale thereof was confirmed by the court and a deed of conveyance thereof executed to them. As we stated before, it is not alleged in the bill of review, when this sale was confirmed, and the deed of conveyance made in pursuance thereof, was executed, and we must presume that it was done immediately after the sale. It is recited in the deed of conveyance from Jackson, Simonton and Engler as trustees to Edward J. Reed *Supra,* that the sale was confirmed by the court on the 8th day of July, 1881, and a deed of conveyance to the purchasers executed on the same day. Be that as it may, the title related back to the day of the sale for all legal purposes and the purchasers acquired a title as of that date.

Amer. & Eng. Ency. of Law (1st ed.) 20 vol. 737, Note 3. Williamson vs. Berry 8 How. (U. S.) 546; 52 Amer. Dec. 105; 46 Amer. Dec. 660; Osterburg vs. Union Trust Co. 93 U. S. 424. 1 Md. Chy. 331; 43 Peene St. 155.

We think the evidence entirely fails to support the alleged new matter relating to the railroad from Lake City to Chattahoochee with branches to St. Marks and Monticello.

We will now discuss the alleged new matter relating to the railroad from Jacksonville to Lake City.

It is alleged in the bill of review that the Florida Central Railroad Company owned this road until the judicial sale thereof on January 6th, 1882, when it was purchased by Edward J. Reed and the sale was confirmed within less than ten days thereafter and that said

Reynolds v. F. C. & P. Ry. Co.—Brief of Appellants.

Reed then for the first time became possessed of it.

Upon referring to the deposition of Phillip Walter on page 220 of the Record and to the deposition of Adolph Engler on page 231 et. seq. of the Record, and the deed of conveyance from Edward J. Reed to the Florida Central and Western Railroad Company (Supra) we find that the evidence sustains this allegation and we take it as true.

But it is not alleged in the bill of review that Edward J. Reed was a bona fide purchaser of said railroad for a valuable consideration and without notice of the State's claim for these taxes. And this evidence proves conclusively that he was not such a purchaser. It shows that he was the mere agent or naked trustee for the corporators of the Florida Central and Western Railroad Company in this transaction and they and not he, were th real purchasers.

Now this railroad was subject to these taxes at the time of the judicial sale thereof on the 6th day of January, 1882, and continued to be subject thereto, notwithstanding such sale, unless it was alleged and proven to have passed to a bona fide purchaser for a valuable consideration and without notice of the State's claim thereto. There is no allegation of this character in the bill of review and no evidence to support it, even if it were there.

In this connection we will remark that the principle which is announced in the 10th head note to the opinion which this court rendered in this suit at its January Term, 1895, is not supported in the body of the opinion. Besides when the court reached the conclusion that neither the plaintiff nor its predecessors were *innocent purchasers* of the railroad involved in this controversy, it

was unnecessary to proceed further and decide what would have been the result if they had been innocent purchasers; consequently it seems that this head note is obiter dicta.

The next question which claims our attention is whether the plaintiff has exercised reasonable diligence to discover and produce this new matter at hearing on the original bill. The exercise of reasonable diligence on the part of the plaintiff was denied in the answer, and the burden was on the plaintiff to prove it by sufficient evidence to overcome the denial in the answer. We have scrutinized the evidence, in vain to discover any proof of that reasonable diligence on the part of the plaintiff, which the law requires in such cases. No evidence whatever has been introduced by the plaintiff on this issue. But it appears from the written evidence introduced by the defendants that the several conveyances ,which bear directly upon this new matter, were on record in the office of the Secretary of State, of Florida at the time of and before the filing of the original bill, and were accessible to the public. They were recorded there in accordance with section 11, Chapter 1987, Acts of 1874, and the plaintiff had constructive notice thereof. The plaintiff could have discovered this new matter by examining these records and his failure to do so has been decided to be gross negligence. Dunont vs. Des Moines Valley R. R. Co. 131 U. S. Appendix CLX.

Furthermore if the plaintiff had applied to Phillip Walter the former Clerk of the United States District and Circuit Courts of the Northern District of Florida, for information concerning the records which were burned he would have discovered the existence of the

certified copy of this record which is in evidence in this court.    Likewise if the plaintiff had applied to A. B. Hawkins and Adolph Engler for information concerning this new matter he would have obtained it.

And when we reflect that the plaintiff's General Counsel and Vice President was the attorney of A. B. Hawkins and Sherman Conant who were receivers when these transactions were going on, we must conclude that the plaintiff has not exercised reasonable diligence to discover and produce them in time to be used in this suit.

In the case of Ryerson vs. Eldred 23 Mich. 537, it was held that parties claiming through a general assignee are bound to inquire of him in a case of a controversy for any facts in his knowledge bearing on it, and failure to do so is gross negligence.

It occurs to us that this decision is applicable to the case at bar.    This plaintiff was deraigning his title through assignments or conveyances made by the said trustees, Jackson, Simonton, Engler and Reed, and in this controversy, it was bound to inquire of them for any facts within their knowledge bearing upon it and failure to do so was gross negligence.

We will now notice the third assignment of error.

The Circuit Judge was prohibited by a writ of prohibition issuing from this court, from entertaining jurisdiction of the subject matter of this part of the decree, of January 8th, 1900, which constitutes this assignment of error; consequently the decree in this particular is void.    This writ of prohibition is a part of the records of this court and judicial notice thereof will be taken. We deem it unnecessary to comment further on this assignment of error.

The writ of prohibition likewise applies to so much of said decree as constitutes the 5th assignment of error.

As to the 6th assignment of error, we will simply state that under the statute of the State of Florida, the costs in civil cases is required to be taxed against the losing party; and a Court of Equity will follow the statute in this particular, unless circumstances develop in the case, which makes it inequitable to do so. Now if the defendants should be sustained in their contentions on this appeal then they ought not to be taxed with the costs in the Circuit Court, as no circumstances have developed in this suit, which makes it inequitable to tax them against the plaintiff.

*T. L. Clarke*, for Appellee.

*Brief for Appellee.*

This is an Appeal in Chancery from a final decree pronounced on January 6th A. D. 1900, by the Judge of the Third Judicial Circuit of Florida at Chambers in Live Oak, Florida, the Judge of the Second Judicial Circuit being disqualified, in a cause then pending in the Circuit Court of Leon County, wherein the Appelle above named was Complainant and the Appellants were Defendants.

"An Appeal in Equity is substantially a re-hearing of the cause and the appeal opens the whole case to the Respondent." So. Life Ins. & Trust Co. v. Cole, 4 Fla., 359.

This is recognized and re-asserted in a number of subsequent cases by the Supreme Court.

The decree appealed from is what it purports to be,

Reynolds v. F. C. & P. Ry. Co.— Brief of Appellee.

—a final decree,—and the only final decree in this cause. As such it must and does dispose of the entire subject matter of litigation in this cause.

The appeal from this decree is a re-hearing of the whole case and opens it to Respondent from its very inception. The court has the power to re-examine and affirm or reverse, modify or correct not only any action of the court below, but its own opinion and orders at any time previously made in this cause. Any opinion rendered by this court upon a former appeal is no more binding now than if such opinion had been rendered in some other cause. This court may, and sometimes does, reverse itself. Its power to do so is co-existent with its convictions of duty.

The appellants assign as error, the refusal of the court, by its final decree, to enjoin the collection of the taxes assessed in 1885 on the line of railroad between Fernandina and Cedar Keys, and Waldo and Ocala for the years 1879, 1880 and 1881, and on the line from Ocala to Wildwood for the year 1881.

This portion of the decree is in obedience to the opinion and mandate of this court, sent down on a former appeal. But we concur with appellants that it is erroneous, and we ask this court, now that the whole case is again before it, to re-examine the original pleadings in the light of the facts disclosed by the testimony since taken, and to correct its own error and the consequent error of the court below.

Our objections to this portion of the decree apply with equal force to the sustaining of that portion of the decree favorble to appellee, and we ask that this court consider the same also in this connection.

Misconception upon the part of the State's counsel

occasioned the whole of this litigation. Their theory of the law from the enactment of the Act of 1885 for the assessment of taxes on this railroad property for the years 1879, 80 and 81, after the exhaustion of the powers of the then existing law in the extortion of three whole years of back taxes, until the Supreme Court determined otherwise, was, that the taxing power was complete and inexhaustible and could be exerted whenever its exercise had been omitted upon this property as part of a class wholly in disregard of changes of ownership. The issues were made on this, and perspicuity was not given to the various changes of such ownership, which being alleged in the bill and not denied in the answer, was not anticipated by the parties. Great reliance was placed on the express limitation of three years on such taxing power, which question was summarily barred out of the case, and incorrectly so we think.

When the time for the assessment and collection of taxes has passed and the taxing statute affixes no lien to the property, the State has made no assessment or taken any steps to collect the same, real estate cannot be pursued for back taxes when it has gone into the hands of innocent purchasers for value. 10th Head Note, 35 Fla., 627.

The court says complainant is not such innocent purchaser,

1. Because Reed and associates purchased in 1879, September, and the time for assessing taxes for that year had not then passed. That they held it in 1880 and 1881 while it became and was liable for the taxes of these three years.

2. On 28th of February, 1882, Reed and associates were incorparted as the F. C. & W. R. R. Co., and such

Reynolds v. F. C. & P. Ry. Co.— Brief of Appellee.

incorporation did not make this company an innocent purchaser for value.

3. In February, 1884, the F. C. & W. and other companies, by consolidation, formed themselves into the F. R. & N. Co., but such consolidation did not give the F. R. & N. Co. the character of an innocent purchaser for value.

4. That the F. C. & P. bought in 1889 and acquired possession of the property with the assessments on it, and consequently subject to these taxes.

But we take it as a clear proposition, that if, in 1884, the several constituent companies instead of consolidating and incorporating themselves into a new company under the name of the F. R. & N. Co., had sold their several lines for value to another corporation, or person, that such new purchaser would have taken the property exempt from the right and power of the State to tax it for the past years 1879, 1880 and 1881.

But it is true, as shown by the bill and admitted by the Answer, that on July 1st, 1884, the F. R. & N. Co. did execute upon the entire system a trust deed to secure its bonds to the amount of ten million dollars, and that more than five million dollars of these bonds were sold for value to *bona fide* holders.

And it is further charged in the Bill, and admitted by the Answer, that several of the constituent companies had previously incurred debts and secured the same by deeds of trust covering their lines respectively, whose bonds were thus outstanding as follows:

The Fla. Transit Co. on May 10th, 1881, $1,000,000. bds.
F. & J. Co. August 11th, 1880,....... 300,000. bds.
F. C. & W. March 9th, 1882,.......... 2,808,000. bds.

The Bill shows, and the Answer admits, that the consolidated mortgage, and the mortgages outstanding and executed by the various constituent companies above mentioned, were all foreclosed, and under the decrees of foreclosure the various constituent lines respectively, and the entire system was sold in 1889 and bought by W. B. Cutting, agent, and he and his associates organized the complainant, the F. C. & P. Co.

These several mortgages mentioned were executed after the time had passed for the assessment of taxes upon this railroad property for the years 1879, 1880 and 1881. The purchasers of the bonds secured by them were innocent purchasers for value. If the State could not go back and tax this property for the years 1879, 1880 and 1881 in the hands of innocent purchasers of the property for value, upon what theory could it tax it to the detriment of innocent holders of the bonds issued and secured by mortgage on the property at a date when the court says a purchaser of the property would have been protected. The value of the bond is dependent upon the value of the property securing it, and the right of the innocent purchaser secured by mortgage on the property is as sacred as that of the innocent purchaser of the property itself. A mortgagee is in Equity a purchaser, and entitled to the same protection as a purchaser. If the State could not subject this property as against the bondholders, the mortgagees, can it subject it in the hands of the F. C. & P. Co? Ledyard v. Butler, 9 Paige 132. Broward v. Hoeg, 15 Fla. 372.

The question is not whether or not an exemption from taxation passed to the purchaser at foreclosure sale. The court disposed of this question by simply holding that the property was liable to taxation in the

hands of the F. R. & N. Co. and its constituent companies. The question is, what title did Cutting take by his purchase at these foreclosure sales? The court, in effect, says he took only the title which the F. R. & N. Co. had after the assessment. This would be true if he had taken only a transfer from the F. R. & N. Co. But he took more than this: he took the rights of the bondholders, and his title under the foreclosure sale went back by relation to the date of the mortgages, and cut out all intermediate liens that the State could, under the law as announced by the Supreme Court, affix to the property after the execution of these mortgages for taxes that the State should have assessed for the years 1879, '80 and '81. In other words, Cutting must be regarded as a purchaser of this property as of the date of the trust deeds securing the several issues of bonds.

That the bondholders were innocent purchasers cannot be questioned, as the State had not passed the Act under which this assessment was subsequently made. Whether of not Cutting had notice when he purchased is entirely immaterial, as he gets his title by paying value and derives it through an innocent purchaser. An innocent purchaser for value without notice can pass his title to any *bona fide* purchaser with notice, and a *bona fide* purchaser for value with notice of the assessment, who takes the title acquired by and through the foreclosure of mortgages antedating the assessment and the passage of the taxing act, takes the same title that the mortgagee would have taken had his mortgage been an absolute conveyance of the property at the time the mortgage was executed.

If, as the court contends, the F. R. & N. Co. having possession of the property was personally chargeable

430    SUPREME COURT.    [42nd Fla.

Reynolds v. F. C. & P. Ry. Co.— Brief of. Appellee.

with these taxes, it may be conceded that this was a proper charge upon its Equity of Redemption in the property, but it could not go to the extent of making it a charge upon the rights of prior mortgagees. If upon the foreclosure of these mortgages, there had been a surplus after discharging the mortgage debts, then such a surplus would have been the property of the defendant corporation free from the lien of bondholders and might reasonably have been charged with the payment of these taxes. But it is shown that there was no such surplus; on the contrary there was a very large deficiency.

The error of the court in forming the conclusion that the F. C. & P. is not a *bona fide* purchaser for value, is in considering only the successive parties who held the possession of the property, and entirely ignoring the true source of the title held by the F. C. & P. Co. The real owners of this property, the parties beneficially interested it, the parties who paid for its construction, in many instances for its maintenance and for the property itself, were the bondholders and not the persons and corporations that held it in possession and operated it. This is the title which the F. C. & P. Co. has acquired through the foreclosure procedings, and to permit the State to enforce the payment of these taxes against such rights and against such a title is to permit the State to do exactly what the Court says it cannot do without impairing the obligation of a contract.

In substance, the court in its opinion says:

"This property was liable to taxation for the years 1879, '80 and '81, and if the State had assessed it within the time permitted by the taxing laws then in force, such assessment would have made the State's claim for

taxes a lien upon the property. But failing to make any such assessment no lien for these taxes then attached to the property. But the obligation on the part of the owners to pay these taxes continued and they were not relieved from this obligation by the failure of the State to reduce its claim for taxes to a lien upon the property. But that the State might by subsequent legislation and the action of its officers affix to its claim for taxes the character of a lien upon this property, provided that such lien could not be made to infringe the rights of *bona fide* purchasers for value who purchased at an intervening time when no law existed under which the State could have reduced its claim for taxes to a lien or enforced it against this property."

Now, if it is conceded by the court that there was a time within which the holders could have sold this property to a *bona fide* purchaser for value free from the payment of these taxes, what reason can be given for the contention that such holders could not within the same time have executed to a *bona fide* mortgage for value a lien upon this property free from the State's right by subsequent legislation to affix to its claims the character of a superior lien upon this property for these past years taxes?

At the time these mortgages were executed the claims in favor of the State for these taxes had not ripened into a lien upon the property, and no law was upon the statute books under which the State could then make it a lien, and no notice or reason then existed to induce any party to act under the belief that the State would afterwards enact any such law as that under which the State now seeks to enforce the payment of this obliga-

gation out of this property. Before any such law was en-
acted, the bondholders *bona fide* put their money in this
property, and the owners gave them a mortgage on it to
secure the money advanced. Can the State without im-
pairing this contract, by subsequent legislation, make its
claim a lien upon this property that would take prece-
dence of the lien of the bondholders? If so, why could
not any other creditor of the F. R. & N. Co. have put his
claim into judgment after the execution of these mort-
gages and thus obtained a lien prior to the lien of the
bondholders? The State at best, under the opinion of
the Supreme Court, prior to the enactment of the
statute of 1885, as to these taxes of 1879, '80 and '81,
occupied the position of an unsecured creditor of the F.
R. & N. Co. Its lien subsequently acquired, under sub-
sequent legislation, cannot be held to take precedence of
a prior lien of a *bona fide* mortgagee. If the State could
by this subsequent legislation thus acquire a lien upon
this property superior to that of the bondholder for
taxes for '79, '80 and '81, for three years prior to the
execution of the mortgage, why can it not go back as far
as 1868 and tax the property for all these intervening
years and thus confiscate it, and leave nothing for the
bondholders or those who claim under the foreclosure
sales? The one is as logical as the other. If the State
can by subsequent legislation force the bondholder, or
those claiming under the bondholder through the fore-
closure sales, to pay three years taxes that were not en-
forceable under any law in existence when the mort-
gages were executed, it can certainly in the same way
force the present holders of the property to pay taxes for
all past years for which taxes were payable and not paid
on the property. The status of this property at the time

these mortgages were executed cannot as to the bond-holder be changed by subsequent legislation. As against the bondholder and those claiming by, through or under him, the State cannot by subsequent legislation put upon this property a burden or an incumbrance that did not exist when the mortgage was executed. Such a statute is not only retroactive, but it impairs the contract entered into between mortgagor and mortgagee, decreases the value of the security, and in this instance takes from the holders of the property under title acquired through the mortgagee, a large sum of money to meet an obligation for a former owner of the property to the State, for which the mortgagee was never responsible, and for which the State at the time the mortgage was executed had no lien on the property, and no law under which it could acquire a lien.

## In Reply to Appellant's Brief.

The order granting leave to file bill of review was made by Judge White of the Third Circuit on September 13th, 1897, and shows upon its face that it was made after notice of the application had been given and filed and after argument by the counsel. Record, p. 129.

Leave to file bill of review for new matter rests in the sound discretion of the court, and it is well settled that this court will never interfere with the discretion of the court below, unless it appears that such discretion has been abused. Hence the authorities are divided as to whether or not an appeal lies from an order granting or refusing leave to file a bill of review, and in every case we find where such appeal has been entertained the appelate court has stood upon the well defined ground of

28

non-interference unless there was an abuse of discretion
in the court below. Enc. Pl. & Pr., Vol. 3, p. 588. Text
and Note 6 with authorities there cited.

The sole question then is, has it been shown that
Judge White abused his discretion in granting leave to
file this petition. The new matter set out in the peti-
tion and bill of review was substantially stated in a sup-
plemental bill filed herein and afterwards considered and
denied by this court as not being the proper remedy.
But this court in its opinion says, "after a careful ex-
amination of all that has been disclosed we are of opin-
ion that justice requires that an order be made in this
court granting permission to appellee to be further heard
in the circuit court to the extent mentioned on account
of the alleged newly discovered matter." Bloxham,
Compt. v. F. C. & P. R. R. Co., 39 Fla., 292-3.

This language was used by this court after it had
determined that the court below had no authority to en-
tertain an application for leave to file a bill of review, ex-
cept upon permission expressly given by the appellate
court. The permission was given by the mandate of this
court. Record, p. 114.

The granting of such permission was in the sound
discretion of this court. It was granted after considering
the newly discovered matter as set out in the supplemen-
tal bill in the nature of a bill of review and because this
court considered "that justice required it." The per-
mission of this court contained in its mandate under all
the circumstances is not only a clear intimation of what
should be done, but almost a command to the court be-
low to grant the leave to file a bill of review.

In discussing the second, fourth and seventh assign-
ments of error, as well as in the argument upon the first,

appellants contend that the new matter set up was known or must have been known to Col John A. Henderson, the vice-president and general counsel of appellee at the hearing upon the original bill.

We recall nothing in the testimony or in the allegations or admissions of any pleading showing that Col. Henderson was at or before said hearing the vice-president or general counsel of appellee. The court will not presume this as a fact nor take judicial knowledge of it. But even if it did appear that he was vice-president and general counsel at and before this hearing, it nowhere appears that knowledge of these facts set up as newly discovered came to him while he was such officer and counsel. Nothing is shown to create even a suspicion that knowledge or notice of such facts came to him at or before said hearing and during his employment and in this transaction. Hawkins says that Col. Henderson was counsel for Hawkins and Conant while they were receivers, but he could not say what he *then* knew of the matters set up as newly discovered. But even if he were conversant with all the facts at that time, this was no notice to other and different parties who happened to employ him in another and different transaction more than ten years afterwards. The notice must be in the same transaction. No client is effected with notice of what came to the knowledge of his counsel in prior and other transactions, to which he was not a party. If such were true, then the safest counsel would be the man of the most limited practice.

"When the counsel comes to have notice of the title in another affair which it may be he has forgot when his client comes to advise with him in a case with other cir-

cumstances, that shall not be such a notice, as to bind the party." Foublanque's Eq., Book 2, p. 154.

The rule laid down requires the notice to be in the same transaction. Citing Lord Hardwick in Warwick v. Warwick, 3 Atk. 291. Hull v. Smith, 14 Ves. 426. Preston v. Tubbin, 1 Vern. 286, 287. Lother v. Carlton, 2 Atk. 139.

Mr. Story says, "Notice, to bind the principle, should be notice in the same transaction, or negotiation; for if the agent, attorney or counsel was employed in the same thing by another person or in another business or affair and at another time, since which he may have forgotten the facts, it would be unjust to charge his present principal on account of such a defect of memory." Story Eq. Jur. Sec. 406.

This is the rule and the reason for its adoption, and whether or not Col. Henderson had full knowledge of these facts pending the receivership of Hawkins and Conant, and whether or not he remembered them when he drew the original bill, if he drew it, and at the hearing thereof, is immaterial, as it can in no event effect appellee with such notice.

Appellants in their brief say that the petition and bill of review must show that the new matter has come to the knowledge of appellee and its agents for the first time since the period at which it could have been used at the hearing. Knowledge coming to an agent, which in law binds the principal, is notice to the principal, and a general denial of notice is a denial of notice actual and constructive. If a denial of knowledge or notice to agents is material to be alleged, then it must be proven at the trial. We submit that a corporation like the appellee here would not be expected or required to pro-

duce proof that these newly discovered facts wre unknown to anyone of its army of agents. The mention of such a proposition refutes itself.

It is alleged and proven that this new matter came to appellee's knowledge *since* the hearing. This is sufficiently definite as to the time.

Appellants say the petition and bill of review allege diligence but set forth no facts showing diligence, and it does not appear that any inquiry was made of the witnesses afterwards examined or other persons likely to have the information afterwards discovered.

The petition and bill allege that the owners and those interested in the property of the appellee corporation were new people and strangers to the proceedings wherein these newly discovered matters occurred. That there had been a complete destruction of all the files and records of the court wherein said proceedings were pending. As a matter of fact, there was no public record showing the receivership of Hawkins and Conant, the former of whom had left the State and the latter long since dead, nothing to show that Walter was clerk of the court, or that Engler was in any way connected with these matters. It was only by the accidental discovery of some portions of old accounts and letters pointing to these parties that led to the inquiry subsequently made. It is alleged that all proper effort was made by appellee and its counsel to discover and set forth every fact and matter material to the case. The array of facts set out in the original bill and appearing in the petition and bill of review show the labor and research bestowed upon it and negative any lack of due diligence in attempting to discover and set forth everything material to the case. The recitals in the deeds produced in evidence by appel-

lant are not contsructive notice of the newly discovered facts, and no reason is shown why it should have been alleged that the public records of the various counties were searched. Appellants marvel that this discovery was not made till after the final hearing when the evidence was so accessible. Every new discovery generally strikes us in the same way and we are surprised it was not sooner known to the world.

Again it is said it is not shown that the new matter if produced at the hearing could have altered or changed the decree. The authorities say it is sufficient if it appears that the production of the matter at the hearing would probably have effected the result. The new matter was substantially set out in the supplemental bill in the nature of a bill of review, and was considered by this court when it directed the court below to entertain an application for leave to file a bill of review. This court certainly considered that this new matter would have effected the result had it been produced at the first hearing.

Appellants say that it does not follow from the allegations in the petition and bill of review that Reed "was an innocent purchaser for valuable consideration and without notice of the State's claim for these back taxes," because forsooth it is not averred that the consideration money was bona fide and truly paid, nor what was paid, nor a denial of notice by Reed of the State's right to tax this road for 1879, 1880 and 1881, and before any consideration was paid. In discussing this question on the second appeal the court says: "If, as a matter of fact, as claimed in the petition filed in the lower court for leave to file the supplemental bill in the nature of a bill of review and in the bill filed, the line of road from Jackson-

ville to Chattahoochee went into the hands of an inno-cent *bona fide* purchaser before the State proceeded to collect taxes for years prior to such purchase, it would be inequitable and unjust to demand them? 39 Fla. 291.

This is exactly the question at issue as to this line of road. It is averred and admitted by both parties all through the pleadings that at the date of Reed's purchase this line had not been assessed for taxes for 1879, 1880 and 1881, and that no attempt was made by the State to assess it or to collect taxes for these years till more than three years thereafter and then only under an Act passed in 1885. We are not required to aver or prove that Reed had no notice of facts which had no ex-istence. He was then an innocent purchaser.

It is alleged that Reed purchased for a full and valu-able consideration, a portion at judicial sale, and a por-tion from the puchasers at another judicial sale, and then and there for the first time became the owner and pos-sessed of this property. This is an allegation of facts that make Reed a purchaser *bona fide* for value. No question is at issue as to the amount of the considera-tion, or its payment. This is not a question arising be-tween different purchasers where it might become ne-cessary to aver and prove the amount of the consider-ation and its actual payment. And even if it were, the allegation that it was purchased at judicial sale carries with it a sufficient averment that it was purchased for a valuable consideration and that the consideration was paid, as no confirmation could be had and no convey-ance be executed till the consideration was actually paid.

The allegation that Engler, Jackson and Simonton purchased at judicial sale in 1879 but did not become the actual owners and possessed of the property till 1882 and

that in the meantime it remained the property of the original owner, the J. P. & M. Railroad Company, is not inconsistent. This allegation is strictly true and is established by the testimony. The judicial sale and the purchase by these parties was never actually completed till confirmation and conveyance and the surrender of possession. Until then it was in fact the property of the original owner and in possession of the court for the use and benefit of the original owner and its creditors, and the title certainly did not vest in Reed and his associates till 1882, when the property had not been assessed and the time for assessment for the years 1879, 1880 and 1881 had passed.

We can see nothing in the sugestion that Jackson, Engler and Simonton may have purchased as agents or trustees. It is sufficient that the title and possession and actual ownership passed to a *bona fide* purchaser for value in 1882.

While it is true that the new matter was not in issue in the original bill, it is also true that it does not introduce a new issue. The question at issue is whether or not this line of road is subject in the hands of the present owners to the taxes assessed against it in 1885 for the years 1879, 1880 and 1881, and on this issue the newly discovered matter is material and relevant, and in support of the case made in the original bill. The newly discovered facts were not in issue, but they support the contention that this property is not liable for these taxes. It is new matter in support of the old issue and under all the authorities cited by appellants is proper matter to be brought forward by bill of review.

Apellants say the newly discovered matter is a purchase for valuable consideration and without notice of

the State's claim, and cite authorities to show that in Equity this is matter of defense and can only be invoked to induce the Court to with-hold assistance from an adversary.

As a general proposition this may be true, but it must be remembered that this is a defensive proceeding on the part of the appellee. The State is attempting to enforce its claim by a seizure and sale of appellee's property under statutory proceedings, and appellee invokes this defense as a shield of protection, and not as a sword for attack.

In reply to that portion of appellant's brief in which the argument is made that the testimony fails to establish the truth of the alleged newly discovered matter, we desire to say, that the consideration of the whole testimony instead of the detached portions quoted in the brief, abundantly establishes the truth of said alleged matter.

In answer to 2nd direct interrogatory, Alexander B. Hawkins says: "I resided during the years 1879, 1880 an 1881 in Tallahassee, Florida. I held an appointment as receiver of the J. P. & M. Railroad Company by appointment of U. S. Circuit Court for the Northern District of Florida during the years aforesaid. I was receiver in the cause of J. Fred Schutte, et al. vs. the J. P. & M. Railroad Co., and its ancillary suits. That receivership covered lines of railroad from Chattahoochee to Lake City, and from Tallahassee to St. Marks, and from Drifton to Monticello, Florida, and the suit was instituted for the foreclosure of the liens of certain bonds of Florida on the lines of railroad aforesaid." Record, p. 208.

Phillip Walter says in answer to 4th and 5th interrogatories, that the suit of J. Fred Schutte, et al. v. J. P.

& M. Railroad Company was pending in the U. S. Circuit Court for Northern District of Florida for the purpose of foreclosing a mortgage for bonds of State of Florida and there was embraced in the suit the Jacksonville, Pensacola & Mobile Road from Lake City to Chattahoochee, which was operated by Conant and Hawkins as receivers. Record, pp. 217 and 218.

Again Hawkins says when called as a witness for appellants: He held the position of receiver of the old Jacksonville, Pensacola & Mobile Railroad Company by appointment of U. S. Circuit Court , Northern District of Florida, and had possession and control of the entire property and estate of said railroad company, and that the receivers held possession of said railroad till it was sold by them about the year 1882 and delivered to the purchasers. Record, p. 237.

The recitals in the deed from Jackson, Simonton and Engler to Reed, put in evidence by appellants, show that this line of road was owned by the Jacksonville, Pensacola & Mobile Company, and that it was sold as the property of said company. Record, p. 253.

This shows conclusively the J. P. & M. R. R. Co. was the owner of this line, and that the receivers held it, received its rents and revenues, and sold it as the property of said conmpany.

The deed from Engler, Simonton and Reed put in evidence by appellants shows that this line was struck off and sold to them by Hawkins and Conant, special masters, for $50,000. Record, p. 253.

This deed is not executed by them as trustees, nor to Reed in trust, but to him, his heirs and assigns forever. Record, p. 254.

The consideration was paid by or through Reed, and was valuable.

Record, p. 228. (Engler's testimony.)

Engler in his testimony says: "Reed was a resident of England. I first became acquainted with him in the summer of 1881, and in connection with the completion of and purchase and the acquiring of the line from Lake City to Jacksonville for the purpose of buying, owning and operating and controlling all and every part of the line which before then was called the Jacksonville, Pensacola & Mobile Railroad * * * all of which took place and terminated after first day of December, 1881, and prior to February 1st, 1882," and he further testifies, that the consideration came out of the people who then for the first time became interested in this property. That Reed also negotiated with the owners of the other lines that afterwards became a part of the Florida Railway & Navigation Company and that he and his associates became subsequently the owners of all of said railroads for valuable consideration, and prior owners ceased to be interested in said property. Record, pp. 231, 232.

This testimony is not contradicted. It shows that Jackson, Engler and Simonton purchased at judicial sale. Reed furnished the purchase money and in consideration thereof they conveyed to him his heirs and assigns forever. That Reed afterwards organized the Florida Central and Western and conveyed to that company cuts no figure. It is sufficiently and abundantly shown that he was in February, 1882, the purchaser of this line bona fide and for a valuable consideration and then for the first time became interested in this property, and

as Engler testifies, "prior owners then ceased to be interested in it."

The testimony establishes unquestionably that Reed purchased the line known as the Florida Central from Jacksonville to Lake City at judicial sale in January, 1882, bona fide and for a valuable consideration. That this sale was confirmed and a conveyance duly executed to him. That the State had not then assessed the taxes for 1879, 1880 and 1881, and made no attempt so to asses them or any claim for such taxes until more than three years afterwards. He could have had no notice then of the States claim for taxes.

MABRY, J.: (*After stating the facts.*)

The record evidence in this protracted case shows that the appellee, the Florida Central and Peninsular Railroad Company, was organized under our general incorporation laws in 1888, for the purpose of owning and operating the properties of the Florida Railway and Navigation Company, a consolidated railway company, under the laws of this State. The entire properties of this latter corporation were sold in 1889 under decrees in the Circuit Court of the United States for the Northern District of Florida, and were purchased by W. B. Cutting, as agent, and he and his associates, under the organization of the Florida Central and Peninsular Railroad Company, assumed possession of the properties so purchased. The Florida Railway and Navigation Company was formed in February, 1884, by consolidation of the Florida Transit and Peninsular Railroad Company, the Florida Central and Western Railroad Company, the Fernandina and Jacksonville Railroad Company and the

Leesburg and Indian River Railroad Company. All of these consolidated lines, involved in this appeal, were constructed prior to 1868 and were entitled to the benefits of an act of the legislature of this State, passed in 1855, and commonly known as the Internal Improvement Act. For non-compliance with the requirements of this act in the payment of interest on bonds that had accrued to the Internal Improvement Fund by reason of its guarantee of the payment of such interest, the entire lines of road now owned by appellee, but then owned by separate organizations, extending from Jacksonville to Quincy, and from Fernandina to Cedar Keys, were sold in the years 1866, 1868 and 1869 and the purchasers organized separate corporations to operate them; one as the Florida Central Railroad Company, extending from Jacksonville to Lake City, one as the Jacksonville, Pensacola and Mobile Railroad Company, extending from Lake City to Quincy, including branches to St. Marks and Monticello, and one as the Florida Railroad Company (assuming the same name), extending from Fernandina to Cedar Keys. The Jacksonville, Pensacola and Mobile road extended its line by construction to Chattahoochee prior to 1873. It has always been a conceded fact that the original lines of railroad built in compliance with the requirements of the Internal Improvement Act prior to 1868 were entitled to the exemptions and benefits therein provided, but subsequent to the adoption of the constitution of 1868 it has not been universally admitted that the corporations subsequently organized for their ownership and control were entitled to exemption from taxation under that constitution. It is true that the purchasers of such lines of railroad claimed the benefit of such exemption and for many years failed

to pay any taxes, but the legislative branch of the State government challenged such right, and in 1881 by joint resolution instructed the Governor and Comptroller to institute legal proceedings against the roads to test the right of exemption from taxation claimed by them. Acts 1881 page 217. The result of the litigation that ensued was adverse to the claim of such roads that the exemption provided for in the eighteenth section of the Internal Improvement Act was an incident of the property and followed it into the hands of purchasers under new organizations, and the roads in such hands were declared to be subject to taxation under the constitution of 1868. Palmes v. Louisville and Nashville Railroad Company, 19 Fla. 231, Ibid. 109 U. S. 244, 3 Sup. Ct. Rep. 193.

In 1885 the legislature by act, Chapter 3558, provided that in all cases in which any railroads or the properties thereto belonging or appertaining in this State in the tax years commencing March 1st, 1879, 1880 and 1881, or any of such years, were not assessed for taxes for such years, it should be the duty of the Comptroller to cause the same, or so much thereof as were not assessed, to be assessed for State and county taxes to the extent and in the manner therein provided. Under this act certain lines of road now owned by appellee and involved in this appeal were assessed in 1885 by the Comptroller for the years 1879, 1880 and 1881, and subsequently in 1891 an additional act was passed, Chapter 4073, to facilitate the collection of the taxes so assessed.

In November, 1892, appellee filed its bill claiming the right as sucessor of the Florida Railway and Navigation Company to recover from the State certain taxes collected from the latter company in part for the year 1881 and for the years 1882, 1883 and 1884, but this de-

mand was refused by the Circuit Court in the first instance, and the decision to this extent was affirmed by this court. Bloxham, Comptroller, vs. Florida Central and Peninsular Railroad Company, 35 Fla. 625, 17 South. Rep. 902. The bill also claimed that all of its constituent lines built under the Internal Improvement Act, or on the routes contemplated by it, were entitled to the exemption of taxation therein provided, which was an effort to reopen and relitigate the questions settled in the case of Palmes v.Louisville and Nashiv1le Railroad Company, *supra*. This contention was rejected by the Circuit Court, and its ruling was also affirmed on the first appeal to this court. The bill had another object in view, and that was to restrain the collection of the taxes for the years 1879, 1880 and 1881, on the ground that the State legislation under which the assessments were made was unconstitutional and void. In this connection it may be stated that appellee's bill in setting up its several claims to relief in demanding a return of taxes paid by the Florida Railway and Navigation Co., and in seeking to have established its right to exemption from taxation under the Internal Improvement Act, detailed a history of the constituent lines of its road, and distinctly claimed to be a purchaser for value in 1889 of all the properties involved, and that its properties were not liable for back taxes assessed for years long prior to their acquisition. It claimed as purchaser of the Florida Railway and Navigation Company under judicial proceedings based upon claims of creditors and for a default in the payment of interest on mortgage bonds issued by this company to retire underlying bonds issued by its constitutent companies. It was also alleged that the Florida Railway and Navigation Company had acquired it

properties in 1884 before the assessment was actually
made by the Comptroller, and that it was not competent
for the State to go beyond that year in the collection of
back taxes. It appeared from the allegations of the bill
that the Florida Railway and Navigation Company was
formed in February, 1884, by consolidation with other
companies, one of which was the Florida Central and
Western Railroad Company, extending from Jacksonville
to Chattahochee; and in reference to this line it is aver-
red that under the terms of the statutory mortgage creat-
ed by Chapter 1716 laws of Florida all that portion of
road between Jacksonville and Chattahoochee, including
branches to Monticello and St. Marks, was sold to Ed-
ward J. Reed on the 25th day of September, 1879, under
decree of foreclosure, and that Reed and his associates
organized the Florida Central and Western Railroad
Company which became invested by deed from Reed
dated 28th February, 1882 with all the rights, privileges
and immunities covered by said mortgage, and of the
charters and statutory benefits of the several constituent
companies, but without becoming in any way obliged
to pay any of the debts or obligations of any of such
companies.

The Circuit Court sustained the contention of ap-
pellees that the act of the legislature directing the levy of
the tax was unconstitutional, and enjoined the collection
of the taxes for the years 1879, 1880 and 1881. On ap-
peal this decision was reversed and the act held to be
valid. Proceeding upon the theory that, when the time
for assessing taxes has passed and there is no statute fix-
ing a tax lien upon property subject to taxation, and no
steps have been taken by the State to collect taxes due,
real estate can not be pursued for back taxes in the

hands of innocent purchasers for value, this court examined the contention of appellee that it was an innocent purchaser within the principle stated. The decision was adverse to such contention. Bloxham, Comptroller, v. Florida Central and Peninsular Railroad Company, 35 Fla. 625, 17 South. Rep. 902. When appellee purchased in 1889 the taxes had long since been assessed and the State was proceeding to collect the same. The consolidation of the Florida Railway and Navigation Company, the immediate predecessor of appellee, occurred in 1884 after the resolution of the legislature had been passed, but the decision was placed upon the ground that the consolidation of railroads under the laws of this State did not make them innocent purchasers for value so as to exempt their property from taxes justly due thereon, but not assessed before the consolidation took place. Reed was alleged to be a purchaser at judicial sale in September, 1879, and in connection with associates formed the Florida Central and Western Railroad Company, one of the consolidated constituents of the Florida Railway and Navigation Company, and on such a state of facts the taxes were declared to be valid charge on the property specified in the opinion of this court rendered at the January term, 1895. 35 Fla. 625, 17 South. Rep. 902. The decision then made on record presented was final, and left nothing for the Circuit Court to do except to enter a decree in compliance with the mandate sent down. Instead of doing so, the Circuit Court permitted a supplemental bill in the nature of a bill of review to be filed, and on appeal this bill was directed to be dismissed, as being filed without leave obtained from this court. 39 Fla. 243, 22 South. Rep. 697. It was there clearly pointed out that when the appellate

court affirms or modifies a decree of a lower court, either as to questions of law or fact necessarily involved, with directions for further proceedings consistent with the opinion, the lower court has no authority to open the case, or enter any other judgment than that directed to be entered, unless authority to do so be given by the appellate court.

In view of what was disclosed in the petition and supplemental bill in the nature of a bill of review in reference to that portion of appellee's line of road from Jacksonville to Chattahoochee, this court was constrained to grant appellee leave to be heard by the Circuit Court on an application for leave to file a bill of review on newly discovered evidence to the extent of the line mentioned, and an order was made to this effect. On petition filed for that purpose the Circuit Judge granted leave to file a bill to review not only that portion of the decree affecting the line of road from Jacksonville to Chattahoochee, but other portions of the road, and not only on the ground of newly discovered evidence, but for errors of law apparent on the record and alleged to have been committed by this court. This was entirely beyond the scope of the permission given by this court, as the Circuit Court had no jurisdiction or authority to permit the decree to be reviewed to any extent beyond that affecting the line from Jacksonville to Chattahoochee, and to this extent only upon the ground of newly discovered evidence. This was clearly pointed out in the decision on the prohibition proceedings reported in 40 Fla. 297, 24 South. Rep. 160.

It appears from the record before us that, notwithstanding the decision referred to, the bill permitted to be filed remained unaltered and the court proceeded on

final hearing to deny the relief asked as to other matters
not affecting the line of road from Jacksonville to Chat-
tahoochee.   In this respect no relief was granted to ap-
pellee, but it is entirely clear from what this court has
already decided in this case that the action of the court
in undertaking to decide anything affecting the decree
directed to be entered by this court beyond the permis-
sion granted was improper and without any authority.
What the court undertook to decide beyond the scope
of the permission granted is void and must be regarded
as forming no part of the case.   The court should never
have entertained an application to review any portion
of the decree beyond the leave granted by this court, and
after the decision on the prohibition proceedings the
pleadings should have been reformed so as to confine the
allegations to the matters authorized to be investigated.
The decree as to all other matters had long before be-
come a finality not subject to be disturbed by even this
court, and the contention made here by counsel for ap-
pellee that the present appeal opens up the entire case
from the beginning is so groundless as to merit no con-
sideration. An appeal from a chancery decree under our
system opens up the case for review in the appellate
court, but the present case has already been before this
court on appeal, and a decree directed to be entered by
the lower court, with permission to apply to that court
for leave to file a bill to review only a part of the decree
when entered on the ground of newly discovered evi-
dence. To the extent of the permission given the parties
had a right to be heard before the Circuit Court and its
action in reference to such is subject to review; but the
decree in all other respects was final when entered, and
must be so regarded. The enquiry, therefore, on this ap-
peal must be confined to the action of the court in ref-

erence to the permission to file, or the sustaining of the bill filed, to the extent of the line of road from Jacksonville to Chattahoochee on the ground of newly discovered evidence.

After the entry of a final decree parties can not as a matter of right file a bill of review on the ground of newly discovered evidence. Leave of the court to file the bill must first be obtained and the granting of such leave rests in the sound discretion of the court. The regular chancery practice recognizes a petition to the court in which the final decree is entered as the proper procedure to obtain leave to file such bill. The showing to be made on this application, including the character of the evidence, its discovery and the required diligence in reference thereto, has been considered by this court in the cases of Owens v. Adm'r. of Forbes, 9 Fla. 325, and Finlayson v. Lipscomb, 16 Fla. 751, and we will not, in this connection, repeat what was then said. Under our laws the preliminary action of the court in granting leave to file the bill on the ground of newly discovered evidence is subject to revision by the appellate court. The appeal in the case of Owens v. Forbes was from an order granting leave to file a supplemental bill in the nature of a bill of review, and the court said it was authorized by the act of the legislature of January 7th, 1853. This act, in reference to the right to appeal, is the same as section 1457 Revised Statutes, and authorizes appeals from any interlocutory order, decision, judgment, or decree of the Circuit Courts when sitting as courts of equity. In the case of Finlayson v. Lipscomb this court reviewed and reversed the action of the lower court in granting leave to file a bill of review after demurrer to the bill permitted to be filed. It must, there-

fore, be accepted as settled with us that the right to object to the court's action in permitting the bill to be filed is open to the party against whom it is presented. In the present case we do not determine whether the court erred in permitting the bill of review to be filed on the showing made for that purpose, as the decree rendered on the bill must be reversed on a point arising thereunder, even if we were to concede that leave to file the bill was properly granted.

We deem it proper to say, in view of the contention made here by counsel for appellee, that the permission given by this court to apply to the Circuit Court for leave to file a bill of review simply left appellee free to do so. The application, if made, was to be judged of by the lower court under the rules applicable to such matters. This court was induced to grant the permission from what appeared on the record before it, but it did not undertake to determine the sufficiency of an application that might be made to a court that was required to exercise its judicial discretion in reference thereto in the first instance.

The bill of review for newly discovered evidence must allege that it is filed by leave of the court, must state the former bill and proceedings, including the final decree entered and the particulars in which the party conceives himself aggrieved, and it must also state distinctly and specifically the evidence alleged to be discovered and that it came to the knowledge of the party after the final decree was entered, or too late to be used at the hearing, and that by the exercise of reasonable diligence it could not have been discovered sooner. "The newly discovered evidence must be relevant and material, and such as might probably have produced a dif-

ferent determination. The new matter must have first
come to the knowledge of the party after the decree. The
matter must not only be new, but it must be such as the
party, by the use of reasonable diligence, could not have
known. It must not be merely cumulative, nor merely
corroborative or auxiliary to what is already in the case;
but must establish a new fact of itself decisive of the
merits of the cause." Owens v. Forbes, *supra*. The re-
quirements stated by this court in the case referred to,
are enforced by the authorities generally, in text-books
and adjudicated cases, and they are material matters not
only to be alleged but established by proof. The ordi-
nance of Lord BACON that is the basis of all the law on
this subject is even more rigid in its requirements than
the rule laid down in this court. 2 Barb. Ch. Pr. page
91. There is a decision in Maryland (Hodges v. Mulli-
kin, 1 Bland's Ch. Rep. 503), to the effect that in an ap-
plication for leave to file a bill of review on the ground of
newly discovered evidence the question of the new dis-
covery must then be traversed and finally determined
and not left open for the bill itself, but this decision has
not been followed by other courts. The authorities are
practically unanimous in holding that after the bill of re-
view is filed it may be demurred to for sufficient reasons
or answered and an issue made on the allegations
therein. This was the view of Judge Story in Dex-
ter v. Arnold, 5 Mason 303, referred to with approval in
the decision of this court in Owens v. Forbes, and was
expressly so held in Elliott v. Balcom, 11 Gray 286. See,
also, the following authorities: Mitford's & Tyler's Pl.
& pr. 186; 2 Daniell's Ch. Pl. & Pr. (6th Am. Ed.) 1584;
Story's Eq. Pl. (10th ed.) §§ 420, 834; 2 Barb. Ch. Pr.
99; Mattair v. Card, 19 Fla. 455; Lewellen v. Mack-

worth, 2 Atkins 40; Jenkins v. Prewitt, 5 Blackf. 7; Burson v. Dosser, 1 Heisk. 754; Carter v. Stennet, 10 B. Monroe 250; Greer v. Turner, 47 Ark. 17, 14 S. W. Rep. 383; Bartlett v. Gregory, 60 Ark. 453, 30 S. W. Rep. 1043; Ketchum v. Breed, 66 Wis. 85, 26 N. W. Rep. 271; Nichols v. Heirs of Nichols, 8 West Va. 174; Buffington v. Harvey, 95 U. S. 99.

The right to have a decree regularly made and entered reviewed on' the ground of newly discovered evidence depends essentially upon the fact that the new evidence came to the knowledge of the party after the decree was made and could not, by the use of reasonable diligence, have been earlier discovered. This fact constitutes an essential equity in the maintenace of a bill and must be proven when put in issue. Alder v. Vankirk Land and Construction Co., 114 Ala. 551, 21 South. Rep. 490. The new matter alleged in the present bill to have been newly discovered after the final hearing is that during the entire time between September, 1879, and February 28th, 1882, the period for which the taxes involved were assessed, a company known as the Jacksonville, Pensacola and Mobile Railroad Company owned the line of road from Lake City to Chattahoochee, with branches to St. Marks and Monticello, and from September, 1879, until the sale of this road and its confirmation it was in the hands of receivers appointed by the United States Court; and that the purchasers of this road, Jackson, Simonton and Engler, conveyed the same to Edward J. Reed, who before this date did not own, possess or receive the income arising therefrom; that the portion from Lake City to Jacksonville was owned and possessed by the Florida Central Railroad Company prior to January, 1882, when it was purchased by Reed, who after the

confirmation of its sale soon thereafter became for the first time possessed and interested therein. The answer sworn to by both defendants, as required by the bill, denies this allegation and expressly puts in issue that this matter was discovered for the first time after the hearing, or by the exercise of reasonable diligence could not have been discovered before then, and the parties went to trial on this issue. The bill further alleges that the foreclosure proceedings, judicial sales, receiverships and transfers of the said several lines of road were had in the Circuit Court of the United States for the Northern District of Florida, where all the papers relating thereto were kept, and that before filing the original bill the court house building where such records were kept, together with such records, was destroyed by fire, but this is not alleged to be a newly discovered fact for the first time after the original hearing in the case. In our opinion it is not shown that appellee by the exercise of reasonable diligence could not have discovered for the first time the alleged new matter before the original hearing in this case, and that to sustain the decree rendered on this point would violate the rules laid down by all the courts on the subject. Some decisions reject the evidence of new witnesses entirely, but where such evidence is accepted, the authorities hold that it should be done with great caution, and only when it is of such a nature as to amount to decisive proof. This is necessary to guard against an improvident reopening of matters already settled in a due course of investigation and to avoid the oppression of protracted litigation. That Edward J. Reed was a purchaser of the line of road from Jacksonville to Chattahoochee at judicial sale was known to appellee when the original bill was filed as this fact is stated

therein, and the importance of ascertaining when this purchase was made should have been known, if it was not. Phillip Walter was clerk of the United States Court for the Northern District of Florida and continued as such until after the filing of the original bill. His office was in this State and accessible to appellee and its agents. It is shown that this clerk was master in the foreclosure proceedings resulting in a sale of the property acquired by Reed and was familiar with all the facts in reference to the foreclosure sales of the line of road in question. In fact, this clerk had in his possession after the destruction of the records by fire, and even at the time he testified in the case, a copy of the foreclosure proceedings, and could have imparted to appellee, or its agents, correct information as to all matters alleged to be newly discovered. There is an entire absence of showing that any inquiry was made by appellee or its agents of this clerk for information in reference to the dates and facts connected with the sales of the road, and no reason is assigned why this was not done. When it becomes necessary to rely upon important facts established in judicial proceedings, a resort to offices where such proceedings were had for information is demanded by ordinary business prudence, and a failure to so search for information can only be attributable to negligence Dumont v. Des Moines Valley R. R. Co., 131 U. S., Appendix CLX. A knowledge of the destruction of such records by fire would naturally suggest an inquiry of the custodian before destruction whether they had been reestablished, or what information he could inmpart of their contents. If it had been shown that a resort was had to the clerk and he misled the parties in reference to contents of records, and on account of their destruction

by fire, no means were accessible to correct the mistake, a different case might exist, but no showing of this kind is attempted. It does not appear that appellee made any search in any office where information could have been obtained in reference to the matters alleged to have been newly discovered, and no effort was made, so far as the testimony shows, to communicate with Reed, the alleged purchaser of the road, in reference to the important fact of when he became purchaser. It also appears that the original bill was signed by the corporation by its vice-president, who also signed the bill as counsel. The testimony shows that the vice-president was counsel for the receivers of the road from Lake City to Chattahoochee from 1879 to 1882. One of the receivers, it appears, died before the bill was filed and the other had removed to North Carolina, but it does not appear that the one in North Carolina had been written to, or in any way communicated with, in reference to the facts connected with Reed's purchase. The receivers, it also appears, acted as masters in the sale of the road. Counsel insist that knowledge of an attorney acquired before he becomes employed in connection with litigation is no notice to the client who subsequently employs him, and that Vice-President Henderson's information acquired as attorney for the receivers can not be imputed to appellee. The question involved in this case is not the tracing of knowledge to appellee, but the use of reasonable diligence by it in obtaining evidence in the case. As stated by Lord ELDON the question is "not what the plaintiff knew, but what, using reasonable diligence he might have known." Young v. Keighly, 16 Vesey, Jr. 348.

The petition for leave to file the bill of review and

Reynolds v. F. C. & P. Ry. Co.—Opinion of Court.

the bill filed were signed by the company by its president and they were also sworn to by him. The only testimony introduced to sustain the bill of review in reference to the exercise of diligence, in discovering the alleged new matter was that of President Duval, and his testimony entirely fails to show that the vice-president and counsel of the company used any diligence whatever in trying to obtain the supposed new matter, and the latter has nothing whatever to say on the subject. No acts of diligence are attempted to be shown by any agent of the company. We have carefully examined the evidence, and without further special reference to it, state our conclusion that it fails to show that the new matter alleged was not known or could not by the use of reasonable diligence have been known to appellee or its agents, in time for use before the hearing of the cause. In the absence of such showing it is impossible to sustain the decree without going contrary to well-settled rules of law on the subject. It therefore becomes unnecessary to examine further whether the new matter did exist, or its character and effect.

The decree of the court enjoining the sale for the taxes assessed for the years 1879, 1880 and 1881 on the line of appellee's road from Jacksonville to Chattahoochee and branches is reversed, and the bill of review is dismissed with costs against appellee. Judgment will accordingly be entered in this court dismissing the bill.

TAYLOR, C. J.: (Dissenting.)

I can not concur in the conclusion reached by the majority of the court in this case. In the majority opinion it is stated that the question of the propriety or im-

propriety of the order of the court below *granting leave* to file the bill of review is not passed upon or determined, and yet, according to my view, the reversal of the decree appealed from is planted solely upon the ground that the showing made for leave to review the former decree does not come up to the rule in such cases, that diligence was not shown to have been used in the discovery of the new matter made the groundwork of the application. The merits of the case as involved in the bill of review filed, and in the new proofs adduced in support thereof, aside from the question of diligence, are not considered, but the reversal is based solely upon what, in my view, is purely a preliminary question in all such cases affecting only the *right to the necessarily precedent order granting leave to file a bill of review*, and the effect of the opinion of the majority is to adjudge that the Circuit Judge erred *in granting leave to file the bill of review* because diligence was not shown in the discovery of the new matter set up in the application therefor. The record before us shows that the application for leave to file the bill of review was by petition to the court below, and that the order granting such leave was made after notice to the opposite party who appeared by counsel at the hearing of such application. No objection by answer, demurrer or otherwise appears by the record to have been made to the passing of the order *granting leave* to file the bill of review, but the appellants saw proper apparently to waive any objection to the granting of such order on the showing made in the application therefor, and in their formal answer to the bill of review when filed attempt to raise the question of diligence in the discovery of the new matter set up therein. In my view the question of *diligence* in such cases affects solely

the question of the right of the party to the pre-
requisite *order granting leave to file the bill of review,* and,
like such order, is necessarily a preliminary question
that *must be adjudicated before the bill of review itself is
filed,* and it ceases to be a material question in the case
after the formal order is made *granting leave to file* such
bill. The appellants having stood by and permitted the
order to be made, granting leave to file this
bill of review, without interposing any apparent
objection thereto, admitted the right of the ap-
pellee to have such review, and waived all de-
fects and shortcomings in the application therefor, in-
cluding the question of diligence and all other questions
upon which the right to such review depended, and it
was too late for them afterwards to reinterject it into the
case in the form of an answer to the bill of review itself.
Hodges v. Mullikin, 1 Bland's Ch. 503. This being true,
I think that this court is confined in its review to the
merits of the case as disclosed in the new matter brought
to light by the bill of review. What is that new matter?
That the line of road from Jacksonville to Chattahoo-
chee, with branches to Monticello and St. Marks,
though sold at judicial sale in September, 1879, to Reed
and associates, did not go into their possession or con-
trol as a consummated purchase until 1882; but until the
last named date remained in the custody of the court
under whose order the sale was made, in the hands and
control of such court's receiver's, and that the said pur-
chase made at the sale in September, 1879, was not
completed by confirmation thereof by the court making
it until 1882, when Reed and his associates became *bona
fide* puchasers for valuable consideration then paid, with-
out notice of any tax lien upon said line of road for the

years 1879, 1880 and 1881, and I think that the proofs offered in support of the above new matter fully sustains its truth with no contradiction save the unsupported denials of the answer. Under these circumstances, according to the former decision of this court in the case, 35 Fla. 625, 17 South. Rep. 902, neither the appellee nor the said line of road in its hands, are chargeable with the taxes for said last named years, assessed under an *ex post facto* statute enacted subsequently to their becoming such purchasers. The great State of Florida can not, in my view, afford to perpetrate such an injustice upon innocent purchasers of property within her borders, for the sake even of rigid adherence to, and enforcement of, a technical rule of practice in her courts.